J-A23028-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: E.L.B., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: F.M.H., MOTHER | : : : : : : | |
| | : | No. 763 MDA 2023 |

Appeal from the Decree Entered April 27, 2023
In the Court of Common Pleas of Luzerne County Orphans' Court at
No(s):  A-9254

BEFORE:   LAZARUS, J., McLAUGHLIN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY McLAUGHLIN, J.:              **FILED:  DECEMBER 27, 2023**

F.M.H. ("Mother") appeals from the decree terminating her parental rights as to her minor child, E.L.B. ("Child"). We affirm.

Child was born in March 2018. N.T., 6/27/22, at 63. When Child was approximately 14 months old, in May 2019, he was placed in the custody of Luzerne County Children and Youth Services ("Children and Youth") due to concerns of domestic violence, drug abuse, and mental health issues by Child's Mother and father.[1] *Id.* at 63-64, 73. Child was adjudicated dependent on June 4, 2019. *Id.* at 64-65. Child was placed in a foster home and has remained in the same foster home for three and a half years. N.T., 12/12/22, at 59.

_____

[*] Former Justice specially assigned to the Superior Court.

[1] Child's father passed away in October 2020.

In December 2021, Children and Youth filed a petition for the involuntary termination of Mother's parental rights. The court held hearings on the petition on June 27, 2022 and December 12, 2022.

Children and Youth presented the testimony of case worker Jamie Stuart. Stuart testified that Mother's goals were to participate in mental health services, including individual and relationship counseling, attend parenting education classes, comply with drug and alcohol services, and attend visitation with Child. N.T., 6/27/22, at 65-66. Stuart stated that Mother completed the parenting education program in August 2021. *Id.* at 67. However, she believed that Mother had not rectified her parenting deficits through the court-ordered services or benefited from the parenting program. *Id.* at 66, 77, 83. Stuart stated that Mother's relationship with Child is "more like a peer relationship as opposed to a parent/child relationship" and Mother did not utilize the information provided to her in the program in her relationship with Child. *Id.* at 66, 77-79. Stuart emphasized that she has observed Mother's visits with Child for three and a half years. *Id.* at 83. Stuart noted that while Child "has a bond with his mother to a degree[,]" there was not a lot of interaction between Mother and Child during the visits and there were no real boundaries. *Id.*

Stuart testified that Mother did not visit Child between August 2021 and February 2022. *Id.* at 68. Mother indicated to Stuart that she was having transportation issues with respect to attending visits. *Id.* Stuart offered to connect Mother with the Wyoming County/Luzerne County transportation

service and provide her with bus passes, but Mother refused the offers. *Id.* at 68, 72, 91-92. Mother began visiting Child consistently in February 2022 when the maternal grandmother provided transportation for Mother. *Id.* at 81-82.

Stuart further testified that Mother never provided her with any documentation of engagement in any drug and alcohol treatment services. *Id.* at 70. Mother also did not submit to any drug screens and did not keep in consistent contact with Children and Youth throughout this case. *Id.* at 71.

Stuart opined that since Child has been in placement, Mother has not remedied the reasons for placement due to her failure to complete services and make appropriate changes. *Id.* at 73. Stuart further testified that Child is assimilated into his foster family, with whom he has lived for three and a half years. N.T., 12/12/22, at 59-60. His foster parents wish to adopt Child and there are two other young children in the home that Child refers to as his sisters. *Id.* at 60, 67. Stuart testified that Child's foster parents meet all his physical, medical, developmental, and emotional needs. *Id.* at 63-64. She indicated that Child is "very bonded" to his foster parents and refers to them as his mom and dad. *Id.* at 65. Conversely, Child refers to Mother as his "visit mom." *Id.* at 66. Stuart stated that while visits go well and Child is bonded to Mother, their bond is not a "strong bond." *Id.* at 69-70. Stuart emphasized that Child needs permanency and is comfortable and stable in his foster home. N.T., 6/27/22, at 73-74. She opined that terminating Mother's parental rights would best serve Child's needs and welfare and Child would suffer no detrimental impact. *Id.* at 73; N.T., 12/12/22, at 67-68.

- 3 -

Samantha Martin from Wyoming Valley Alcohol and Drug Services ("WYVADS") testified that WYVADS contacted Mother several times to arrange for her to undergo a drug and alcohol evaluation. However, an appointment was never scheduled, and Mother has not engaged in any evaluations or treatment programs at WYVADS. N.T., 6/27/22, at 11-14.

Alicia Singer, a therapist from Robinson Counseling Center, testified that Mother attended a mental health evaluation intake appointment on October 18, 2021. *Id.* at 19-20. Singer stated that after the intake appointment, Mother was diagnosed with major depressive disorder with recurrent episodes, post-traumatic stress disorder, and borderline personality disorder. *Id.* at 20. It was recommended that Mother attend individual outpatient therapy. *Id.* After several no-shows by Mother, Mother attended an initial therapy session on April 7, 2022. *Id.* at 21-22. At that session, Mother requested to be referred to medication management as she was struggling with her moods. *Id.* at 22, 28. Mother failed to attend any further therapy sessions. *Id.* at 23-34, 28.

Lisa Ross testified that she is employed by Concern, which is an agency that provides foster care and community-based services. *Id.* at 31. Ross stated that she is part of the Intensive Family Reunification Program at Concern and served as Mother's parent educator. *Id.* at 31-32. Ross testified that Mother was referred to the program due to the following concerns:

- Mother stated in the past that she was bipolar and suffered from depression;

- prior to Child's father's death in 2020, Child's father was physically abusive toward Mother and Mother chose to remain in the abusive relationship;

- Mother has a tendency "to flip flop between men" and does not stay in one place very long;

- Mother will often go between the maternal grandmother's or the boyfriend's home;

- Mother was not employed;

- Mother struggled with focusing on the age-appropriate needs of Child; and

- Mother had voluntarily consented to have her parental rights terminated as to three other children.

*Id.* at 33.

Ross testified that Mother completed the parenting education program in July 2021. *Id.* at 37. She noted that the program "increased her knowledge base of what it means to be a parent[,]" and especially helped Mother to become more empathetic. *Id.* at 48-49.

Ross further testified that she observed three visits between Mother and Child. *Id.* at 38. Ross stated that although there were no safety concerns, she believed that Mother "failed to utilize all the[] skills" that she learned in the parenting program. *Id.* at 38, 40. Ross indicated that while Mother loved to cuddle with Child and watch videos with him, she "tended to parent from a

seated position" and minimally engaged with him. *Id.* at 38-39. However, Ross observed that Mother and Child have a very good bond. *Id.* at 55.

Ross testified that she was unable to recommend unsupervised visitation upon Mother's completion of the program because Mother had pending DUI and possession of drug paraphernalia charges and there were concerns that Mother was using drugs other than medical marijuana. *Id.* at 40. She also noted that Mother was recently married and there were concerns about domestic violence in that relationship. *Id.* at 40-41.

As to housing, Ross testified that Mother had purchased a mobile home and had done a lot of renovations on the home. *Id.* at 42. There were a few repairs that still needed to be made and Ross was unsure if the home had a bedroom for Child. *Id.* However, the home's kitchen, living room, and dining room were appropriate. *Id.* Ross noted that during one of her visits at Mother's home, there was drug paraphernalia left on the kitchen table. *Id.* at 43. Mother informed Ross that it was her medical marijuana, but Ross was concerned because it was left on a table and Child could access it if he were in the home. *Id.* at 43-44. Ross further observed that Mother's paramour smelled like marijuana when he emerged from the bedroom during the visit. *Id.*

Deborah Scott, a visitation case worker at Vision Quest, testified that she supervised approximately 10 visits between Mother, Child, and maternal grandmother, and that the visits went well. *Id.* at 115-116. Scott testified that when Child arrived at the visits, he had bruises on him. *Id.* at 117-118.

However, Scott's written visitation report indicated that she saw no bruises on Child when Mother brought the issue to Scott's attention. *Id.* at 121-123.

Scott further testified that when Child arrived at the supervised visits, he was happy to be with "mom and dad." *Id.* at 126. When asked if she meant Mother and maternal grandmother since Child's father is deceased, Scott replied, "All of them. I mean, every visit." *Id.* Scott further indicated that when the visits with Mother and maternal grandmother ended, Child would cry and fight because he did not want to leave them. *Id.* at 127. However, when counsel for Children and Youth questioned Scott as to why that information was not included in any of her reports, she responded, "I don't know." *Id.* at 128.

Scott also testified that she believed that Child did not look to his foster father as being his father. *Id.* at 131. However, Scott admitted that in her report dated April 9, 2022, she stated that Child calls his foster father "Daddy" and "that it appears that's who [Child] looks to as his dad." *Id.* at 133.

After the direct examination of Scott, the court continued the hearing to conclude on a subsequent date. *Id.* at 136. The court asked Children and Youth to investigate Scott's allegations of bruises and a chipped tooth on Child. *Id.* at 137.

At the continued termination hearing on December 12, 2022, Scott failed to appear to complete the remainder of her testimony. *See* N.T., 12/12/22, at 6. The court was informed that Scott was no longer employed by Vision Quest and Children and Youth was unable to locate Scott's

whereabouts. *Id.* Children and Youth instead presented the testimony of the Director of Operations at Vision Quest, Jeremy Collins. Collins testified that Mother had supervised visits with Child every other Saturday at Vision Quest. *Id.* at 12. He stated that maternal grandmother would also attend the visits. *Id.* Collins indicated that he and another employee supervised the majority of the visits, whereas Scott only supervised a "handful" of visits. *Id.* at 13-14. He stated that on one occasion, Mother told him there was a bruise on Child. *Id.* at 14. He examined Child and did not see a bruise. *Id.* Collins testified that he never saw any indication that Child was being abused or neglected and that Child never made any statements to him that he was being harmed. *Id.* 15-16. Collins said that the visits go very well and that Mother is always appropriate with Child. *Id.* at 26. He stated that Child has a strong bond with Mother and looks forward to the visits with her. *Id.* at 26-27.

Stuart, the case worker from Children and Youth, was recalled to testify at the continued hearing. She testified that Children and Youth investigated Mother's allegations that the foster parents were inflicting injuries on Child and it determined that the allegations were unfounded. *Id.* at 61. Stuart believed that, based on her involvement in the case for over three years, Child was being properly cared for by the foster parents and she had no suspicions that Child was being abused. *Id.* at 62.

Mother testified on her own behalf. She stated that she is consistent with her medication management. N.T., 6/27/22, at 98-99. She testified that she is currently on probation after pleading guilty to possession of a controlled

substance and possession of drug paraphernalia. N.T., 12/12/22, at 45-46. Mother said that she completed a drug and alcohol evaluation through her probation but has been unable to access it, so she has not provided it to Children and Youth. N.T., 6/27/22, at 100; N.T., 12/12/22, at 43-44. Mother testified that she currently lives in a three-bedroom house with her husband and mother-in-law. N.T., 6/27/22, at 107-108. Mother stated that the home is appropriate and that there is bedroom for Child. ***Id.***, N.T., 12/12/22, at 79-80. Mother indicated that she is not employed but her husband works full-time and supports her and would support Child. N.T., 12/12/22, at 54, 79.

Mother further testified that Child calls her "Mommy" and they have an "amazing bond." ***Id.*** at 82. Mother stated that if Child was returned home to her, she would be able to meet all his physical, developmental, and educational needs. ***Id.*** at 79.

Child's Guardian *ad litem* ("GAL") recommended that it was in Child's best interest to terminate Mother's parental rights. ***See*** GAL's Recommendation Letter, filed 3/8/23, at 5 (unpaginated). The GAL did not believe that termination would have any detrimental impact on Child. ***Id.*** at 6 (unpaginated).

The trial court found that Children and Youth proved by clear and convincing evidence that Mother's parental rights should be terminated under Section 2511(a)(2), (5), and (8) and Section 2511(b) of the Adoption Act. This appeal followed. Mother raises the following issues:

I.    Whether the trial court abused its discretion, committed an error of law and/or there was insufficient[] evidentiary support for its finding that [Mother's] parental rights should be terminated pursuant to 23 Pa[.]C.S.A. [§] 2511(a)(2), (5), and (8).

II.   Whether the trial court abused its discretion, committed an error of law and/or there was insufficient evidentiary support for its finding pursuant to 23 Pa[.]C.S.A. [§] 2511(b) that it is in the best interest of the minor Child to grant the termination of [Mother's] parental rights.

Mother's Br. at 4 (unpaginated).

Mother first argues that Children and Youth failed to present clear and convincing evidence to warrant the termination of her parental rights. She contends that she completed a drug and alcohol evaluation through adult probation and is consistent with her medication management. *Id.* at 11 (unpaginated). She also argues that she completed a parenting education program and the testimony from Ross was that Mother strongly benefited from the program. *Id.* at 9, 12 (unpaginated). Mother also points to the testimony that her visits with Child are appropriate and go very well. *Id.* at 9-12 (unpaginated). She further stresses that she has safe and stable housing. *Id.* at 11 (unpaginated).

We review an order involuntarily terminating parental rights for an abuse of discretion. *In re G.M.S.*, 193 A.3d 395, 399 (Pa.Super. 2018). We "accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citation omitted). "If the factual findings have support in the record, we then determine if the trial court committed an error of law or abuse of discretion."

- 10 -

*In re Adoption of K.C.*, 199 A.3d 470, 473 (Pa.Super. 2018). We will reverse a termination order "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012).

A party seeking to terminate parental rights has the burden of establishing grounds for termination by clear and convincing evidence. *In re Adoption of K.C.*, 199 A.3d at 473. Clear and convincing evidence means evidence "that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." *Id.* (citation omitted).

Termination of parental rights is controlled by Section 2511 of the Adoption Act. *In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007). Under this provision, the trial court must engage in a bifurcated analysis prior to terminating parental rights:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*Id.* (citations omitted). To affirm the termination of parental rights, this Court need only affirm the trial court's decision as to any one subsection of Section 2511(a). *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*).

Instantly, the court found termination proper under Sections 2511(a)(2), (5), and (8), as well as under Section 2511(b). As only one basis for termination under 2511(a) is necessary, we will focus on the court's termination of Mother's parental rights under Section 2511(a)(8), which states:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> \*\*\*

> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(8).

Section 2511(a)(8) "sets a 12-month time frame for a parent to remedy the conditions that led to the children's removal by the court." *In re A.R.*, 837 A.2d 560, 564 (Pa.Super. 2003). Once the 12-month period has been proven, the court "must next determine whether the conditions that led to the children's removal continue to exist." *Id.* "As a result, the relevant inquiry in this regard is whether the conditions that led to removal have been remedied

and thus whether reunification of parent and child is imminent at the time of the hearing." ***In re I.J.***, 972 A.2d 5, 11 (Pa.Super. 2009). "Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of Agency services." ***In re Z.P.***, 994 A.2d 1108, 1118 (Pa.Super. 2010).

Instantly, it is undisputed that at the time of the filing of the termination petition, Child had been out of Mother's care for 31 months. Therefore, we next focus our inquiry on whether the conditions that led to Child's removal from Mother's care continued to exist at the time the court terminated Mother's parental rights.

The court found that the conditions that existed at the time of Child's placement continued to exist. ***See*** Opinion Pursuant to Pa.R.A.P. 1925(a) ("1925(a) Op."), filed 6/23/23, at 24. The court noted that Mother either failed to complete the required services or benefit from any completed services. ***Id.***

We discern no abuse of discretion. The record supports the court's finding that the conditions that led to Child's removal from Mother's home continue to exist. The conditions that led to removal were concerns about domestic violence, drug abuse, and mental health issues. The testimony was that although Mother claimed that she completed a drug and alcohol evaluation through her probation, she did not provide any documentation that she had done so to Children and Youth. Moreover, there were concerns that Mother was using drugs other than medical marijuana, Mother failed to submit

to any drug screens, and she had recently pleaded guilty to possession of a controlled substance and possession of drug paraphernalia. Further, while Mother underwent an initial mental health evaluation, she failed to attend individual therapy except for one session. The record also reflects that although Mother completed the parenting education program, she did not successfully benefit from it.

Further, while Mother's visits with Child were appropriate and went well, Mother never progressed from supervised visits to unsupervised visits in an over three-year period. Mother also failed to visit Child for a six-month period between August 2021 and February 2022, even though help with transportation to the visits was offered by Children and Youth. Thus, the evidence was sufficient to establish termination under Section 2511(a)(8) due to Mother's failure to remedy the conditions that led to Child's removal from her care.

Mother next maintains that Children and Youth failed to present clear and convincing evidence that termination best served the needs and welfare of Child, as required by Section 2511(a)(8) and Section 2511(b). Mother argues that she has an "amazing" bond with Child and that Child calls her "Mommy." Mother's Br. at 14. She maintains that there was testimony by numerous case workers that she and Child have a strong bond, and that she can meet all of Child's needs during visits. *Id.* Mother further points to the testimony of Scott, the former Vision Quest employee who failed to appear at

the second hearing, who had concerns with the foster parents due to bruises on Child. *Id.*

Under Section 2511(b), the trial court must consider "the developmental, physical and emotional needs and welfare of the child" to determine if termination of parental rights is in the best interest of the child. 23 Pa.C.S.A. § 2511(b). This inquiry involves assessment of "[i]ntangibles such as love, comfort, security, and stability[.]" *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa.Super. 2005). The court must also examine the parent-child bond, "with utmost attention to the effect on the child of permanently severing that bond." *Id.* Nevertheless, the "mere existence of an emotional bond does not preclude the termination of parental rights." *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011). Rather, the court must consider whether severing the bond "would destroy an existing, necessary and beneficial relationship." *Id.* (citation omitted). The trial court must also examine any pre-adoptive home and any bond between the child and the foster parents. *In re T.S.M.*, 71 A.3d at 268.

Here, the trial court determined that Children and Youth had established by clear and convincing evidence that termination was proper under Section 2511(b). The record supports the court's finding. Stuart testified that Child is thriving in his foster home, which is a pre-adoptive home. Child has lived in his foster home for most of his young life. Stuart observed that Child is very bonded to his foster parents and sisters, and his foster parents meet all his physical, medical, developmental, and emotional needs.

- 15 -

With respect to the allegation that the foster parents inflicted bruises on Child, Children and Youth determined it to be unfounded. Moreover, the court found Scott's testimony regarding the bruising not credible. **See** 1925(a) Op. at 19. The court stated:

> Throughout her testimony, Ms. Scott seemed disoriented and appeared to be having a difficult time understanding some of the questions asked of her by counsel for Children and Youth. The [c]ourt finds that Ms. Scott was unresponsive to many questions on direct examination. This [c]ourt finds that Ms. Scott was not credible as a witness. Her testimony was inconsistent with her written reports. She also had trouble and difficulty answering simple, direct questions, and she would often not answer the questions but testify on matters unrelated to the questions.

*Id.*

Further, while there was evidently a bond between Mother and Child, Stuart, who observed visits for over three and a half years, testified that Mother and Child's relationship was more like a peer relationship than a parent/child relationship. The court found Stuart's testimony to be credible. **See id.** at 14. The evidence also showed that Child would suffer no detrimental impact if Mother's parental rights were terminated. Accordingly, we agree with the court's finding that Children and Youth proved by clear and convincing evidence that termination of Mother's parental rights was in Child's best interest.

Decree affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/27/2023